## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

JOHN DOE TF-01,
JOHN DOE TF-02,                                    Case No.
JOHN DOE TF-03,                                    Hon.
and JOHN DOE TF-04,

      Plaintiffs,

vs.

THE UNIVERSITY OF MICHIGAN,
THE REGENTS OF THE UNIVERSITY
OF MICHIGAN (official capacity only),

      Jointly and Severally,

      Defendants.

---

**Flood Law PLLC**
Todd F. Flood (P58555)
Rachel K. Wolfe (P79204)
Attorneys for Plaintiffs
155 W Congress St Ste 603
Detroit, MI 48226-3267
(248) 547-1032
tflood@floodlaw.com

---

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs, JOHN DOE TF-01, JOHN DOE TF-02, JOHN DOE TF-03,  and JOHN DOE TF-04,  by and through their attorneys, Todd F. Flood and the Flood Law PLLC and for their Complaint against The University of Michigan ("UM") and the Regents of the University of Michigan ("Regents"), collectively referred to as "Defendants," state as follows:

1

## I.    <u>INTRODUCTION</u>

1.     While employed as a physician by UM from 1966 until 2003, Dr. Robert Anderson (Anderson) used his position to repeatedly and regularly sexually assault university students.

2.     As early as 1968, or on information and belief even earlier, UM received complaints from male students about Anderson sexually assaulting them during putative medical examinations.

3.     In 1979, UM removed Anderson from his position as Director of University Health Services (UHS) after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus.

4.     UM then allowed Anderson to continue to practice at UHS through at least 1981, practice in the UM Health System including at the East Ann Arbor Health Care Facility, provide clinical instruction at UM Medical School, and practice as a physician in the Athletic Department, where Anderson continued sexually assaulting male students and others until he retired in 2003.

5.     UM hid Anderson's past, present, and future sexual abuse of young men from public disclosure. The fact that Anderson was given free rein to abuse hundreds —perhaps thousands—of male students with impunity was, in the end, a calculated risk deemed worth taking by Defendants for the greater good of UM.

6.     While UM students and/or patients of UM's Health System, Plaintiffs

sought medical treatment at UHS and other medical facilities on UM's campus.

7.     Plaintiffs were encouraged by UM to utilize UHS and UM Health System for all of their medical care.

8.     Prior to their first semester at UM, new students attend an orientation with their parents where they learn that UHS will "provide most of your health care while you are at the university."

9.     In fact, as students they paid a mandatory "health service fee" as part of their tuition each term to fund clinical and wellness services at UHS; then, at the time of their medical visits, the students pay nothing.

10.     UHS, the UM Health System, and Anderson provided medical services to both students and non-student patients.

11.     For example, UM Health System and Anderson provided physicals to students and non-students for a number of reasons, including but not limited to, eligibility for sports teams, travel abroad programs, admission to medical schools, and renewals of pilot licenses.

12.     UM touted its medical services to Plaintiffs as "one of the largest health care complexes in Michigan," "many groundbreaking medical and technological advancements," "deliver[ing] the Michigan Difference through cutting-edge research and premier patient care," and "among the best in the nation in a broad range of adult and pediatric specialties."

13.     Plaintiffs relied on UM's representations about its premier patient care and the Michigan Difference when they sought medical treatment at UM and from Anderson.

14.     Anderson sexually assaulted, abused, and molested Plaintiffs, by nonconsensual genital manipulation and digital anal penetrations under the guise of medical treatment.

15.     UM is responsible for Plaintiffs' damages stemming from Anderson's sexual assaults on UM's campus, as UM placed vulnerable students, like Plaintiffs, in Anderson's care despite knowing he was a sexual predator.

16.     This is a civil action against UM for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs as a result of the acts, conduct, and omissions of Defendants in their official capacity, and their respective employees, representatives, and agents relating to sexual assault, abuse, molestation, and nonconsensual sexual touching and harassment by Anderson against Plaintiffs while UM students and/or patients of UM and Anderson.

17.     Plaintiffs file this case anonymously because of the extremely sensitive nature of the case as Plaintiffs were victims of sexual assault, and the suit will require disclosure of information "of the utmost intimacy"; Plaintiffs are therefore entitled to protect their identity in this public filing by not disclosing their names. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185–

86 (5th Cir. 1981).

## II.     <u>JURISDICTION AND VENUE</u>

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is a civil action arising from the Constitution, laws and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*., and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

19.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1343 as this is a civil action authorized by law brought by a person to redress the deprivation, under color of a State Law, statute, ordinance, regulation, custom or usage, of a right, privilege or immunity secured by the Constitution of the United States or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and a civil action to recover damages or to secure equitable relief under an Act of Congress providing for the protection of civil rights.

20.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

21.     The claims are cognizable under the United States Constitution, 42

U.S.C. § 1983, 20 U.S.C. § 1681 *et seq.*, and under Michigan Law.

22.     The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

23.     The events giving rise to this lawsuit occurred in Washtenaw County, Michigan which sits in the Southern Division of the Eastern District of Michigan.

24.     Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

25.     Plaintiffs' Complaint is timely filed within the applicable statutes of limitations and under M.C.L. § 600.6431(3).

## III.     <u>PARTIES</u>

26.     Plaintiff John Doe TF-01 is a resident of the State of Texas.

27.     Plaintiff John Doe TF-02 is a resident of the State of Texas.

28.     Plaintiff John Doe TF-03 is a resident of the State of Michigan.

29.     Plaintiff John Doe TF-04 is a resident of the State of Michigan.

30.     UM is a public university organized and existing under the laws of the State of Michigan.

31.     UM receives federal financial assistance and is therefore subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

32.     The Regents of the University of Michigan is a body corporate, with

the right to be sued, vested with the government of the university. M.C.L. § 390.3 and 390.4.

33.     The Regents govern the entire institution of UM including but not limited to, UHS, the UM Health System, UM Medical School, and the Athletic Department.

34.     Defendants are not immune from suit under the Governmental Tort Liability Act, M.C.L. § 691.1401, *et seq*., or any other statute.

## IV.    <u>COMMON FACTUAL ALLEGATIONS</u>

35.     From 1966 until 2003, Anderson was a physician employed by UM treating students on UM's Ann Arbor campus, during which time UM gave Anderson unfettered access to young male college students and non-student patients of UM Health System.

36.     On information and belief, UM hired Anderson on or about September 1, 1966 as the Clinical Instructor in Internal Medicine and Surgery for UM's Medical School and the Senior Physician of UHS; Anderson gave physicals and administered other purported medical care to student-athletes, non-athlete students, and non-students.

37.     It was sometime soon after beginning employment with UM that, according to the public statement of Ambassador Ron Weiser, the current chair of UM's Regents, Anderson abused Ambassador Weiser while Weiser was a freshman

wrestler at UM.

38.     On or about October 1, 1968, UM promoted Anderson to UHS Director.

**UM was warned in 1968 by an undergraduate student that Anderson was a sexual predator.**

39.     In 1968 or 1969, a gay UM student, Gary Bailey, went for an examination by Anderson, an examination that Bailey later described to *The Detroit News* as "very traumatic."

40.     Bailey states "he (Anderson) had me drop my pants, he felt my penis and genitals, and subsequently, he (Anderson) wanted me to feel his (Anderson's) penis and genitals." Bailey further states, "Back then you did not question a doctor's authority . . . He asked me to pull on his penis."

41.     Bailey filed a written complaint with UHS complaining that Anderson had dropped his pants and asked him to fondle his genitals during the exam.

42.     No one from UHS or any other UM agency followed up with Bailey or contacted him as part of an investigation into Bailey's written sexual assault complaint.

43.     On information and belief, UM never acted on and/or investigated Bailey's complaint against Anderson.

44.     In 1973, Anderson fondled the genitals of another undergraduate man to the point of ejaculation. The complainant reported this incident in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs

(LARA).

45.     On information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted UM as Anderson's employer. Yet, UM took no action and continued to employ Anderson until his voluntary retirement in 2003.

**UM was warned again in 1975 by an undergraduate student that Anderson was a sexual predator.**

46.     UM's head wrestling coach in 1975, Bill Johannesen, admitted that whenever one of his wrestlers went to Anderson they had to "drop their drawers" even if the injury was to the wrestler's elbow.

47.     In 1975, Tad Deluca, a UM student and scholarship athlete on UM's wrestling team, gave notice of Anderson's sexual misconduct in a 10-page letter to Coach Johannesen, complaining, among other things, that "Something was wrong with Anderson, regardless of what you are there for, he *insists* that you 'drop your drawers and cough," (Emphasis added.)

48.     Neither UM, Coach Johannesen, nor any agents of UM investigated Deluca's complaints about Anderson's sexual assaults; instead Coach Johannesen revoked Deluca's athletic scholarship and kicked him off the wrestling team.

49.     Deluca appealed to then Athletic Director Don Canham and provided him with a copy of the letter sent to Coach Johannesen, giving Director Canham direct and explicit notice of the allegations against Anderson.

50.     Director Canham refused to investigate the sexual abuse complaints against Anderson, and instead, upheld the revocation of Deluca's athletic scholarship.

51.     Deluca had to hire an attorney and appeal to UM's Board of Intercollegiate Athletics before his scholarship was reinstated.

52.     On information and belief, UM's Board of Intercollegiate Athletics concluded DeLuca's allegations were credible. Yet, UM still did nothing to stop Anderson from sexually abusing its students.

**UM was warned again in 1976 by another student that Anderson was a sexual predator.**

53.     Another student who filed a similar complaint against UM in the Eastern District of Michigan attended UM in the 1970s.

54.     Anderson repeatedly groped this student's penis and testicles (and digitally penetrated his anus) during approximately 25 visits to Anderson for a variety of illnesses and injuries.

55.     After one of those visits in 1976, this student approached both the head track coach, Jack Harvey, and assistant track coach, Ron Warhurst, and told them that Anderson was touching and groping his penis and testicles during Anderson's medical examinations. At the time, the student was too embarrassed to tell his coaches about Anderson's digital penetration of his anus.

56.     After reporting Anderson's "odd" or "weird" conduct to Coach Harvey

10

and Coach Warhurst, the student asked to go to another physician so he could get medical assistance for his injury(s).

57.     Both Coach Harvey and Coach Warhurst laughed at the student's complaint and refused to send him to a different physician.

58.     During this same period in the mid-1970s, numerous track athletes called Anderson "pants down doctor."

## UM was warned again in 1979 by a graduate student that Anderson was a sexual predator.

59.     According to records of the Washtenaw County Prosecutor's Office, in 1979, a then-graduate student at UM was seen by Anderson at UHS and reported that Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable . . . he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

60.     This graduate student complained loudly to the desk clerk at UHS, and then to an administrator, both of whom "dismissed" him and ordered a security guard to escort the student out of UHS, instead of investigating his allegation against Anderson.

## UM was warned again around 1979 by a UM Student Life employee and activist that Anderson was a sexual predator preying on gay students.

61.     In 1979, a UM Student Life employee and local UM activist told his boss, Tom Easthope, the then-Vice President of Student Life at UM, that Anderson

had assaulted several members of the gay community at UM.

62.     Vice President Easthope, who had supervisory oversight of UHS, believed from his employee's account that Anderson was "fooling around with boys in the exam room."

63.     Indeed, the same UM Student Life employee who made the report to Easthope had personal knowledge of Anderson's abuse: when he was examined by Anderson during a routine physical, Anderson stuck his finger in the Student Life employee's anus, and when the employee jumped from pain and discomfort, Anderson stated, "I thought that YOU would have enjoyed that!"

**UM acknowledged in 1979 that Anderson was a sexual predator.**

64.     Based on the information reported to him, Easthope decided to terminate Anderson, even though he was nervous about doing so because Anderson was a "big shot" at UM.

65.     Easthope confronted Anderson directly with the accusation he was sexually molesting male students in the exam room, and Anderson did not deny it.

66.     Easthope told Anderson, "You gotta go."

67.     After firing Anderson, Easthope decided to allow Anderson to resign his position to avoid an employee termination fight which would delay Anderson's departure from UHS and presumably UM.

68.     Neither Easthope nor his superiors or subordinates followed up to

ensure that Anderson left UM after his severance from UHS.

69.     When Easthope was recently confronted about Anderson, Easthope claimed he was unaware UM continued to employ Anderson as a physician after 1979 and estimated "I bet there are over 100 people that could be on that list (of young men abused by Anderson)."

70.     According to UM human resource records, instead of terminating Anderson, UM "demoted" him effective January 14, 1980 and continued to employ Anderson.

71.     According to longtime UM athletic trainer Russell Miller, Athletic Director Canham, a legendary and powerful figure at UM, "worked out a deal" to allow Anderson to continue to work for UM, including the Athletic Department.

72.     Dana Mills, the then-Administrative Manager at the UHS, said the "V.P.'s Office" would have been responsible for Anderson's hiring by the Athletic Department.

73.     Anderson was highly regarded as a university physician, especially by leaders in the Athletic Department, including a longtime UM athletic trainer who called Anderson an "unbelievable team doctor"; another UM athletic trainer who called Anderson "very incredible"; and one longtime coach of the UM football coaching staff during the 1980s, 1990s, and 2000s who called Anderson "a tremendous asset."

74.    Indeed, UM went so far as to overtly and fraudulently conceal Anderson's predatory sexual conduct against college age males and the reason for Anderson's termination/demotion, by praising Anderson in the published Acknowledgement preface of Volume III of the President's Report of THE UNIVERSITY OF MICHIGAN for 1979-1980.

75.    UM outrageously lied in this publication by telling the public: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

76.    UM outright lied when it described Anderson's departure as voluntary and concealed his known and admitted sexual abuse of students by audaciously lauding his "leadership" when UM and its executives knew that: (1) Easthope fired Anderson for his sexual assaults on male students, and (2) Anderson's termination was changed to a written demotion in his human resources file, so Anderson could remain employed by UM.

77.    The demotion gave Anderson free reign to abuse hundreds of male students and others, like Plaintiffs, with impunity.

14

78.     After his demotion for sexually abusing students on campus, Anderson was propped up for decades as "the" medical authority of UM and the Athletic Department, including the football team, by authority figures of the UM Athletic Department, including its Athletic Director, Don Canham.

**UM allowed Anderson to treat students even after he was "fired" as UHS Director in 1979.**

79.     It is a sign of Anderson's power and influence at UM that he was allowed to continue practicing at UM even after being "fired" as UHS Director in 1979.

80.     After 1979, Anderson was allowed by UM to continue to practice at UHS through at least 1981, practice at other offices in Ann Arbor including the East Ann Arbor Health Care Facility, and provide clinical instruction at UM Medical School, until he retired in 2003.

81.     In January 1980, Anderson was "demoted" from his position as Director of Health Service to a position as "Senior Physician" with UHS where he continued to treat and molest male students through at least 1981.

82.     In 1993, UM acquired Anderson's private practice and he continued to work as a physician at the East Ann Arbor Health Care UM Facility where he continued to treat and molest male students until he retired in 2003.

83.     Anderson also remained a Clinical Instructor in the Internal Medicine Department at UM Medical School until he retired in 2003.

15

**UM failed to act despite repeated assaults and reports of repeated assaults.**

84.     Anderson treated UM students and others for every medical ailment, complaint, and injury as a primary care physician. He served as their first medical point of contact no matter the injury or ailment at issue, including everything from a cold to the flu to broken bones. UM gave Anderson unfettered access to sexually abuse its students until Anderson elected to retire in 2003.

85.     Because UM took no action to investigate the complaints from students that began as early as 1968, and took no corrective actions even after Easthope attempted to fire Anderson in 1979, students and others were needlessly and sexually assaulted, abused and molested by Anderson through nonconsensual digital anal penetration, and nonconsensual sexual touching of genitals.

86.     The young males Anderson abused did not understand (as UM did) the nature of the treatment Anderson administered, or rather that his putatively necessary medical treatment was not offered to heal them but rather to satisfy Anderson's sexual perversions.

87.     Although uncomfortable with the treatments, the students were led to believe by those in authority, including UM's administration and Anderson himself, that the treatments were medically necessary or helpful.

88.     At all relevant times, Anderson maintained an office at UM in Ann Arbor, Michigan.

89.    At all relevant times, including the years 1966 to 2003, Anderson was acting within the course and scope of his employment or agency with UM.

90.    At all relevant times, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or UM.

91.    As UM President Schlissel has stated, "The patient-physician relationship involves a solemn commitment and trust."

92.    Because UM took no action to investigate complaints since 1968, took no corrective action to stop Anderson's abuse, and knew of Anderson's sexual abuse of male students under the guise of medical treatment which put him in a position to commit further acts of genital manipulation and digital anal penetrations of young males between 1966 and 2003, UM knowingly placed Plaintiffs in a position where they would likely be sexually abused.

93.    And because of UM's failure to act, despite its knowledge that Anderson was preying on male college students and others under the guise of medical treatment, Plaintiffs were in fact sexually assaulted, abused and molested by Anderson by nonconsensual digital anal penetration and sexual touching of the genitals.

94.    Plaintiffs' assaults could have and would have been prevented if UM had acted on and/or investigated complaints against Anderson that UM had notice

17

of as early as 1968.

95.    Plaintiffs' assaults could have and would have been prevented if Defendants fired Anderson in 1979 when he was confronted by his supervisor about sexually assaulting students on campus.

96.    The assaults on Plaintiffs could have and would have been prevented if UM had told Plaintiffs (or their parents) of the allegations of sexual molestation made against Anderson, as Plaintiffs would have chosen to see another doctor.

97.    UM failed to do anything to prevent Plaintiffs' sexual abuse.

98.    Through Anderson's position with UM and his notoriety and respect in the UM community, particularly among high-ranking UM administrators, Anderson used his position of authority as a medical professional to abuse Plaintiffs without any supervision by UM.

99.    All of Anderson's acts were conducted under the guise of providing medical care at his office at UM.

**UM stalls its disclosure to the public and its former students for 19 months.**

100.    On July 18, 2018, UM alumnus, Tad Deluca, sent a letter to Warde Manuel, UM Athletic Director, notifying Manuel—as he did Don Canham in 1975—of Anderson's sexual assault while Deluca was a student at UM from 1972 to 1976.

101.    On information and belief, although UM requested its campus police department open a non-public investigation in response to Mr. Deluca's letter to

Athletic Director Manuel, it took no further action to notify former students and/or the public about the allegations, Anderson's long history of sexual abuse of UM's students, and/or its investigation until compelled to do so by *The Detroit News* 19 months later.

102.   As UM President Schlissel admitted on February 20, 2020, "Our (UM) police found indications that U-M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams."

103.   As stated above, at least one of UM's Board of Regents had personal knowledge that Mr. Deluca's written allegations received on July 18, 2018 were true: Ron Weiser, chairman of the UM Board of Regents.

104.   Another member of the UM Board of Regents, Regent Paul Brown, recently stated publicly that three members of his family who were students at UM were also sexually assaulted by Anderson.

105.   Nonetheless, Defendants took no steps to notify the public or its alumni about Anderson's abuse until compelled to do so by the press in February 2020.

106.   Defendants' 19-month delay in notifying the public and alumni about Anderson's abuse of students is consistent with the pattern of UM's recent reactions to sexual abuse allegations: for several years, Defendants have been under intense media, public, legal, and governmental scrutiny regarding their mishandling of sexual harassment and sexual assaults committed by faculty members, including, but

not limited to Professor David Daniels; several Title IX complaints by students in recent years; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

**Plaintiffs trusted and relied on UM administration who told them to utilize UHS and UM Health System, which meant treating with Anderson.**

107.    Plaintiffs chose UM for their college education and/or health care above all others because, among other reasons, its tradition, the universal respect for the University, and its national reputation for leadership and integrity.

108.    UM offered affordable and/or free medical care to its students with their paid tuition, so Anderson's services were readily available to Plaintiffs for free.

109.    Plaintiffs trusted and relied on UM administration who told them to utilize UHS and the UM Health System and see Anderson and on UM's representations that it offered the best medical care, including Anderson as one of the best doctors, and so it followed that they trusted Anderson as their physician.

110.    Never in Plaintiffs' time as young males or as mature adults has another doctor fondled Plaintiffs' penis and testicles for as long as Anderson did.

111.    Nor have Plaintiffs ever been subjected to a digital anal penetration during a routine physical examination as with Anderson.

112.    On none of these occasions that Plaintiffs were seen by Anderson had Plaintiffs complained about any ailment or injury involving their penis, testicles, or anus – or any symptom or complaint remotely related to those body parts.

113.   At the time of Anderson's treatment—not knowing: (1) Anderson's acts were motivated by a criminal sexual intent and (2) that UM knew of Anderson's criminality, yet intentionally and wantonly gave him access to sexually abuse male students like Plaintiffs—Plaintiffs trusted representations made to them that Anderson's actions, under the guise of medical treatment and in the confines of a medical examination room on UM's campus, were medically necessary and/or beneficial as treatment and/or a diagnostic prognosis.

114.   When the abuse began, Plaintiffs, young and naïve men away from home, trusted Anderson as a medical professional and authority figure.

115.   At the time, Plaintiffs had no medical training or experience, and were not aware that Anderson's nonconsensual genital fondling and nonconsensual digital anal penetrations were not medical treatment but instead sexual assault, abuse, and molestation.

116.   Because of the discomfort, disorientation, shame, and guilt brought on by Anderson's odd and weird conduct, Plaintiffs then had difficulty trusting any doctors or other medical professionals after Anderson's assaults.

## V.   PLAINTIFFS' SPECIFIC FACTUAL ALLEGATIONS

### A.   John Doe TF-01

117.   Plaintiff John Doe TF-01 attended UM in the 1970s as an undergraduate student.

118.   As a freshman in the fall of 1974, Plaintiff John Doe TF-01 became ill

21

with mononucleosis and went to UHS when he became dehydrated.

119.  At his first appointment with Anderson for mononucleosis, Anderson both groped Plaintiff John Doe TF-01's genitals and then digitally penetrated his anus.

120.  Plaintiff John Doe TF-01 had to see Anderson for a follow up appointment, and to obtain a required written letter to present to his professors to excuse him from assignments and exams while he was ill.

121.  On more than one appointment, Anderson groped Plaintiff John Doe TF-01's genitals and digitally penetrated his anus.

122.  On one occasion, Anderson "milked" Plaintiff John Doe TF-01's prostate through digital penetration of his anus to have him produce pre-ejaculate.

123.  The revelation that Defendants not only knew Anderson was engaging in sexual assaults during the time period wherein Plaintiff John Doe TF-01 was himself molested, but worked to conceal his actions in order to keep Anderson on staff despite this knowledge, has caused Plaintiff John Doe TF-01 to suffer shock and extreme anxiety, in addition to other damages more specifically described in the general allegations of damage at the end of the counts section herein, *infra*.

**B.**   **John Doe TF-02**

124.  Plaintiff John Doe TF-02 attended UM in the 1970s as an undergraduate student.

125.   Plaintiff John Doe TF-02 was a rising junior at UM in the summer of 1976, and needed a physical as part of the entry process to attend a year abroad student program.

126.   Plaintiff John Doe TF-02 went to UHS for his physical, and was examined by Anderson.

127.   Near the end of the physical, Anderson asked Plaintiff John Doe TF-02 to lay down naked facing up on the examining table and to pull his legs back.

128.   Anderson then digitally penetrated Plaintiff John Doe TF-02's anus with his gloved finger and "massaged" Plaintiff John Doe TF-02's prostate for nearly a minute.

129.   Plaintiff John Doe TF-02 "recall[s] the exam like it was yesterday," including Anderson "explain[ing] that massaging the prostate was a healthy thing to do to release fluids which may be built up in the prostate."

130.   The revelation that Defendants not only knew Anderson was engaging in sexual assaults during the time period wherein Plaintiff John Doe TF-02 was himself molested, but worked to conceal his actions in order to keep Anderson on staff despite this knowledge, has caused Plaintiff John Doe TF-02 to suffer shock and extreme anxiety, in addition to other damages more specifically described in the general allegations of damage at the end of the counts section herein, *infra*.

**C.    <u>John Doe TF-03</u>**

131.   During the 1980s, Plaintiff John Doe TF-03 was a college student and a football player.

132.   During the summers, Plaintiff John Doe TF-03 worked a summer job in Ann Arbor.

133.   In the summer of 1981, Plaintiff John Doe TF-03 needed a physical for his football eligibility and saw Anderson for the physical.

134.   When Anderson examined Plaintiff John Doe TF-03, they were the only ones in the examining room.

135.   During this exam, Anderson asked Plaintiff John Doe TF-03 to lay face up on an examining table.

136.   Anderson then unbuckled Plaintiff John Doe TF-03's pants and asked him to pull his pants and underwear down.

137.   Anderson then manipulated Plaintiff John Doe TF-03's testicles during what Anderson described was a routine hernia check.   This went on for approximately 2 to 3 minutes.

138.   Anderson then began to fondle Plaintiff John Doe TF-03's penis in a stroking manner for 1 to 2 minutes.

139.   At the time, Plaintiff John Doe TF-03 was only 18 years old, and had been raised to trust doctors.

140.   As a result, Plaintiff John Doe TF-03 did not tell his parents about what

he now knows was an assault by Anderson.

141.   The revelation that Defendants not only knew Anderson was engaging in sexual assaults during the time period wherein Plaintiff John Doe TF-03 was himself molested, but worked to conceal his actions in order to keep Anderson on staff despite this knowledge, has caused Plaintiff John Doe TF-03 to suffer shock and extreme anxiety, in addition to other damages more specifically described in the general allegations of damage at the end of the counts section herein, *infra*.

**D.    John Doe TF-04**

142.   In the late 1990s and early 2000s, Plaintiff John Doe TF-04 was a student at Concordia University in Ann Arbor, Michigan, and was also dually enrolled at UM through the Army Reserve Officers' Training Corps (ROTC) program.

143.   In 2000, Plaintiff John Doe TF-04 was required to undergo a physical as part of his Army commissioning process.  On or about September, 2000, Plaintiff John Doe TF-04 went to UHS and was examined by Anderson.

144.   During this examination, Anderson digitally penetrated Plaintiff John Doe TF-04's anus under the guise of conducting a rectal and prostate exam.

145.   At the time, Plaintiff John Doe TF-04 questioned whether the Army would require a cadet of his age to undergo a rectal/prostate exam but was assured by Anderson that a rectal/prostate exam was a "necessary" aspect of the Army's

required physical.

146.   Plaintiff John Doe TF-04 "always thought that something wasn't right about that encounter [with Anderson]."  However, in light of Anderson's assurances, Plaintiff John Doe TF-04 did not raise alarm over Anderson's actions.

147.   The revelation that Defendants not only knew Anderson was engaging in sexual assaults during the time period wherein Plaintiff John Doe TF-04 was himself molested, but worked to conceal his actions in order to keep Anderson on staff despite this knowledge, has caused Plaintiff John Doe TF-04 to suffer shock and extreme anxiety, in addition to other damages more specifically described in the general allegations of damage at the end of the counts section herein, *infra*.

## VI.   <u>FRAUDULENT CONCEALMENT</u>

148.   The statute of limitations is tolled when "a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim" under M.C.L. § 600.5855.

149.   Both Anderson, and Defendants, through their employees, agents, and representatives, fraudulently concealed the existence of Plaintiffs' claims by (1) concealing from Plaintiffs that the uncomfortable procedures conducted during medical examinations were in fact sexual abuse, (2) concealing from Plaintiffs that UM and its employees, agents, and representatives were aware of Anderson's sexual

abuse and did nothing to stop it, (3) affirmatively telling Plaintiffs the procedures were normal and/or necessary, (4) publishing a statement that Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by university students, and (5) concealing from Plaintiffs that UM was aware of Anderson's abuse since at least 1968, thereby concealing UM's identity from Plaintiffs as a "person who is liable for the claim," as set forth in more detail below.

**A.** **Anderson's Fraudulent Concealment Imputed to UM.**

150. Anderson made affirmative representations to Plaintiffs, referred to collectively as "Anderson's representations," that:

a.      Anderson's genital groping and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

b.      Anderson's genital groping and digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 25, with no reported issues related to genitals and/or anus;

c.      Anderson was not sexually assaulting Plaintiffs;

d.      Plaintiffs should not question and/or report the conduct to appropriate authorities;

e.      Defendants, through their employees, agents, and representatives were aware of Anderson's treatments, that they still subjected Plaintiffs to it, and that they believed the treatments to be normal, necessary, proper, appropriate, legitimate, and/or medically beneficial; and

f.      there was no possible cause of action against Anderson and/or

UM.

151.  Anderson's representations were false. The UM Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college students.

152.  Anderson knew the representations were false. He conducted the sexual assaults for no reason other than for his own empowerment, sexual gratification, and/or pleasure. Anderson knew genital examinations and digital anal penetrations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty, particularly as the patients were young men (generally ages 17-25).

153.  Anderson's representations were material, in that had Plaintiffs known the representations were false, Plaintiffs would have stopped seeking treatment from Anderson immediately.

154.  Anderson's representations were made with the intent that Plaintiffs would rely on them as Anderson sought to continue sexually assaulting Plaintiffs, and others, evidenced by the fact that Anderson did, in fact, continue sexually assaulting Plaintiffs, and others.

155.  Anderson's representations were also made with the intent of

28

concealing from Plaintiffs that they had a cause of action against Anderson and/or UM.

156.    Plaintiffs did, in fact, rely on Anderson's representations; indeed, Anderson's representations led Plaintiffs to continue seeking treatment from Anderson, and had they known Anderson's representations were false, Plaintiffs would have stopped treating with Anderson.

157.    Anderson knew that Plaintiffs were, and Plaintiffs were in fact, particularly susceptible to believing Anderson's misrepresentations because:

      a.    Plaintiffs were young, naïve men when Anderson abused them;

      b.    Anderson's representations were made within the context of a pervasive culture created by statements made by representatives of UM that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

      c.    Plaintiffs had no prior experience with legitimate and appropriately performed treatments that involve genital and anal examinations, so it was impossible for Plaintiffs to differentiate a legitimate and appropriately performed genital or anal examination from a sexual assault;

      d.    Plaintiffs could not have possibly known because there were no parents, guardians, caregivers, and/or other medical professionals in the room during the genital examinations to observe, question, and/or discover that Anderson's treatments were sexual assaults, and this concealment from other adults deprived them of the opportunity to inform Plaintiffs that they had been sexually assaulted and had a cause of action;

      e.    Based on Neuroscience, the prefrontal cortex of the brain, which is used to make decisions and distinguish right from wrong, is

not fully formed until around the age of 25;

f.    Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.    Plaintiffs were intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.    Plaintiffs trusted Anderson due to his notoriety and reputation;

i.    Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were young men, who were not knowledgeable or aware of the civil justice system and applicable remedies at law;

j.    Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action when they were not aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations from students and the public in general;

k.    Plaintiffs had never previously heard about allegations in the media regarding sexual assaults or misconduct by Anderson, as there were no such reports; and

l.    Plaintiffs were never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from parents and others.

158.   Accordingly, Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Anderson and/or UM until they read an article published on or about February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiffs became aware they were the

victims of sexual assault and that UM indirectly or directly caused the abuse by being aware Anderson was a sexual predator and failing to stop Anderson from harming students.

159. Anderson also breached a fiduciary duty to Plaintiffs, and so his failure to disclose material information was fraudulent.

160. Anderson further concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry, so he and Defendants would escape investigation, in that he:

    a.     prevented other medical professionals, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs while he sexually assaulted Plaintiffs; and

    b.     did not abide by or follow the standard of care which requires another medical professional, parent, guardian, and/or caregiver be in the room during the examination and treatment of minor patients.

161. Anderson's representations caused Plaintiffs' injuries related to: (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assaults on or about February 19, 2020; and (3) discovering Plaintiffs' beloved alma mater that they devoted their life to, in many respects, betrayed them by placing them in the care of a known sexual predator.

162. Plaintiffs incorporate, by reference, the paragraphs above and below regarding damages suffered by Plaintiffs as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's

31

fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

163.   Anderson committed Fraudulent Concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so he and Defendants would escape investigation.

164.   At all times pertinent to this action, Anderson was an agent, apparent agent, servant, and employee of UM and operated within the scope of his employment, and his negligence is imputed to UM.

165.   At all times pertinent to this action, Plaintiffs were free of any negligence contributing to the injuries and damages alleged.

**B.**   **Defendants' Fraudulent Concealment.**

166.   Defendants, through their employees, agents, and representatives made affirmative representations to Plaintiffs, referred to collectively as "Defendants' representations," that:

   a.   Anderson was to be trusted and not questioned, and his devotion to medical care at UM was worthy of public recognition and celebration, stating: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of THE

32

UNIVERSITY OF MICHIGAN for 1979-1980;

b.    Anderson was to be trusted and not questioned as his services were worthy of recognition by UM dedicating "the Annual Report to him" even though UM and its executives knew that Easthope had fired Anderson for his inappropriate sexual conduct toward male students;

c.    Anderson's genital groping and anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

d.    Anderson's genital groping and anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 25, with no reported issues related to genitals and/or anus;

e.    Plaintiffs were required to be subjected to Anderson's treatments as they were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

f.    Anderson would treat their ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

g.    Anderson was not sexually assaulting Plaintiffs;

h.    Plaintiffs should not question and/or report the conduct to appropriate authorities;

i.    These affirmative representations were reasserted each time Defendants sent a student to Anderson for treatment as each referral to see Anderson was an affirmative representation that Anderson was competent, ethical, and would "do no harm." otherwise assault the respective students; and

j.    there was no possible cause of action against Anderson and/or UM.

167.  Defendants' representations were false. The UM's Public Safety

33

Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college students.

168.   Defendants knew the representations were false. Defendants received several complaints since, at least, 1968 about Anderson's sexual assaults prior to Plaintiffs arriving on campus. Indeed, Defendants removed Anderson from his position as UHS Director in 1979 because of sexual assault allegations, thereby demonstrating UM's knowledge the representations were false.

169.   Defendants made the material representations, knowing they were false and/or made the material representations recklessly, without any knowledge of their truth and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Anderson from other students and knew that the appropriateness of his genital examinations and digital anal penetrations had been questioned in the past.

170.   Defendants' representations were material, in that had Plaintiffs known the representations were false, they would have stopped seeking treatment from Anderson immediately.

171.   Defendants' representations were made with the intent that Plaintiffs would rely on them as UM sought to prevent Plaintiffs from discovering they had a

34

cause of action against Anderson and/or UM.

172.   Plaintiffs did, in fact, rely on Defendants' representations; indeed, the representations led Plaintiffs to treat with Anderson, and continue seeking treatment from Anderson, and had they known the representations were false, Plaintiffs would have never treated with Anderson.

173.   Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in that they:

    a.    Refused to terminate Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

    b.    Affirmatively lied in written publications about Anderson "resigning" from UHS when he was fired, and then reinstated but demoted him, for assaults on male students;

    c.    Hid Anderson's past, present, and future sexual abuse of young men from public disclosure;

    d.    Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Anderson's genital and anal examinations; and

    e.    Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers be present during an examination of a minor or young student by a physician.

174.   Defendants knew that Plaintiffs were, and Plaintiffs were in fact, particularly susceptible to believing Defendants' representations because:

    a.    Plaintiffs were young, naïve men when abused by Anderson;

35

b.      Defendants' representations were made within the context of a pervasive culture created by statements made by UM representatives that Anderson's treatments were necessary and Anderson was a competent and ethical physician, to be trusted and never questioned;

c.      Plaintiffs had no prior experience with legitimate and appropriately performed treatments that involve extended genital examinations or digital anal penetrations, so it was impossible for Plaintiffs to differentiate a legitimate and appropriately performed genital or anal examination from a sexual assault;

d.      Plaintiffs could not have possibly known because there were no parents, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that his genital examinations and digital anal penetrations were sexual assaults and inform Plaintiffs that they had been sexually assaulted and had a cause of action;

e.      Based on Neuroscience, the prefrontal cortex of the brain, which is used to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f.      Based on Neuroscience, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.      Plaintiffs were intimidated by Anderson's notoriety and reputation and therefore believed his representations;

h.      Plaintiffs relied on UM's Administration and trusted Anderson due to his notoriety and reputation;

i.      Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were young men, who were not knowledgeable or aware of the civil justice system and applicable remedies at law;

j.      Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action when they were

36

not aware of any other students coming forward with allegations of abuse, particularly since Anderson and UM concealed any such allegations;

k.    Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Anderson; and

l.    Plaintiffs were never told by Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others.

175.  Accordingly, Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Anderson and/or Defendants until they read an article published on or about February 19, 2020, regarding a complaint filed with UM's Police Department by a student abused by Anderson, at which point Plaintiffs became aware they were the victims of sexual assault and that Defendants indirectly or directly caused the abuse by being aware that Anderson was a sexual predator and failing to stop him from harming students.

176.  In addition to affirmative false representations, UM officials, agents, and representatives failed to disclose to Plaintiffs that they were being sexually abused and that Anderson had a history of committing sexual assaults in the guise of medical treatment.

177.  Because UM had a fiduciary duty to Plaintiffs, the failure to disclose material information is also fraudulent.

178.   At all times pertinent to this action, the employees, staff, managers, supervisors, and directors of Defendants were agents, apparent agents, servants, and employees of Defendants and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendants.

179.   Defendants' representations caused Plaintiffs' injuries related to: (1) the sexual assaults; (2) discovering Anderson's uncomfortable treatments were in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiffs' beloved alma mater that they devoted their life to, in many respects, betrayed them by placing them in the care of a known sexual predator.

180.   Plaintiffs incorporate, by reference, the paragraphs above and below regarding damages suffered by Plaintiffs as a result of UM's responsibility for Anderson's sexual assaults, UM's awareness and responsibility for Anderson's fraudulent misrepresentations about the sexual assaults, and/or UM's fraudulent misrepresentations.

181.   Defendants committed Fraudulent Concealment, as described in detail above and below.

## VII.   COUNTS AGAINST DEFENDANTS

### COUNT I:
### VIOLATION OF TITLE IX, 20 U.S.C. § 1681(A), ET SEQ.[1]

---

[1] Plaintiffs outline their damages, which is needed for many of the following counts, in general allegations at the end of the counts section below, and those general damage allegations are incorporated by reference into all applicable counts to avoid

182.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

183.   Title IX's statutory language states, "No person in the United States shall on the basis of sex, be . . . subject to discrimination under any education program or activity receiving Federal financial assistance . . . ."

184.   Plaintiffs are "persons" under the Title IX statutory language.

185.   UM receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX (of the Education Act of 1972, 20 U.S.C. § 1681(a), *et seq*.

186.   UM is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

187.   The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

188.   Anderson's actions and conduct were carried out under one of UM programs, which provides medical treatment to students and the public.

189.   Anderson's conduct and actions toward Plaintiffs, that being nonconsensual and unnecessary genital manipulation, constitutes sex discrimination

---

excessive redundancy and for ease of reading by the Court, the parties, and the public.

under Title IX.

190.   As early as 1968, or earlier, an "appropriate person" at UM had actual knowledge of the sexual assault, abuse, and molestation of young men committed by Anderson.

191.   Specifically, Defendants were notified about Anderson's sexual abuse and molestation by young male students in or around 1968, 1975, 1979, and, on information and belief, on many other occasions before and after 1980.

192.   Defendants failed to carry out their duties to investigate and take corrective action under Title IX following the complaints of sexual assault, abuse, and molestation in or around 1968.

193.   After the 1968, 1975, and 1979 complaints, Anderson continued to sexually assault, abuse, and molest young male students, including but not limited to Plaintiffs.

194.   Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

  a. Failing to investigate and address other victim's allegations as required by Title IX;

  b. Failing to adequately investigate and address the complaints regarding Anderson's conduct; and,

  c. Failing to institute corrective measures to prevent Anderson from violating and sexually abusing other students and individuals, including minors.

195.   Defendants acted with deliberate indifference as their lack of response

to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of the known circumstances.

196.   Defendants' responses were clearly unreasonable as Anderson continued to sexually assault students and other individuals and Plaintiffs until he retired from UM in 2003.

197.   Between the dates of approximately 1968-2003, and perhaps earlier, Defendants acted in a deliberate, grossly negligent, and/or reckless manner when they failed to reasonably respond to Anderson's sexual assaults and sex-based harassment of young male students on school premises.

198.   Defendants' failure to promptly and appropriately investigate, respond to, and remedy the sexual assaults after they received notice subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying their access to educational opportunities at UM, including medical care.

## COUNT II:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – STATE CREATED DANGER

199.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

200.   The due process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty or property without due process of law.

201.   Defendants deliberately exposed Plaintiffs to a dangerous sexual

predator, Anderson, knowing Anderson could and would cause serious damage by sexually assaulting male students on campus.

202. This conduct was culpable in the extreme.

203. Plaintiffs were foreseeable and certain victims of Defendants' decisions to not investigate the complaints from students that began as early as 1968, to not take corrective actions, and to allow Anderson to remain employed as a primary care physician at UM.

204. Plaintiffs' sexual assaults were foreseeable and direct.

205. The decisions and actions to deprive Plaintiffs of a safe campus constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injuries, to Plaintiffs.

206. Defendants acted in willful disregard for the safety of Plaintiffs.

207. Defendants have a fiduciary duty to protect students, like Plaintiffs, from harm; and Defendants breached that duty by allowing Plaintiffs' sexual assault by placing students in the care of a known sexual predator.

208. Defendants created the opportunity for Anderson to sexually assault Plaintiffs, an opportunity that he would not otherwise have had but for Defendants' failure to investigate the complaints from students that began as early as 1968, failure to take corrective actions, and allowing Anderson to remain employed as a physician at UM when it was known to Defendants that he was a sexual predator.

209.   At all relevant times, Defendants and Anderson (as Defendants' agent) were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

## COUNT III:
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – RIGHT TO BODILY INTEGRITY

210.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

211.   The due process clause of the 14th Amendment includes an implied right to bodily integrity.

212.   Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

213.   At all relevant times, Defendants and Anderson were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

214.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in Defendants' positions should have known.

215.   As a matter of custom, policy, and/or practice, Defendants had and have

the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

216.   Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

217.   Defendants' failure to address these patients' complaints led to an unknown number of individuals (aside from Plaintiffs) being victimized, sexually assaulted, abused, and molested by Anderson.

218.   Additionally, Defendants' failure to properly address the 1968, 1975, 1979, and other complaints regarding Anderson's sexually assaultive conduct also led to others being victimized, sexually assaulted, abused and molested by Anderson. Indeed, all that UM needed to do was fire Anderson in 1979.

219.   Ultimately, Defendants failed to adequately and properly investigate the complaints of Plaintiffs or other similarly situated individuals including but not limited to failing to:

> a.   Not foist Anderson on the population of young naïve males, who would be unlikely to complain about Anderson's conduct;
>
> b.   Perform a thorough investigation into improper conduct by Anderson after receiving complaints; and
>
> c.   Thoroughly review and investigate all policies, practices,

procedures and training materials related to the circumstances surrounding the conduct of Anderson.

220.   By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to reports of Anderson's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

221.   Defendants are also liable to Plaintiffs under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

222.   Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Anderson, with the result that Anderson was allowed to violate the rights of persons such as Plaintiffs with impunity.

## <u>COUNT IV:</u>
## <u>FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983</u>

223.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

224.   Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Anderson and all faculty and staff regarding their duties toward students, faculty, staff and visitors.

225.   Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

    a.    Perceive, report, and stop inappropriate sexual conduct on campus;

    b.    Provide diligent supervision over students and other individuals, including Anderson;

    c.    Report suspected incidents of sexual abuse or sexual assault;

    d.    Ensure the safety of all students, faculty, staff, and visitors to UM's campuses premises;

    e.    Provide a safe environment for all students, faculty, staff, and visitors to UM's premises free from sexual harassment; and

    f.    Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

    g.    The above list of duties is not exhaustive.

226.   Defendants failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiffs' rights.

227.   Defendants' failure to adequately train was the result of Defendants' deliberate indifference toward the well-being of students.

228.   Defendants' failure to adequately train is closely related to or actually caused Plaintiffs' injuries.

229.   As a result, Defendants deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

## COUNT V:
## VIOLATION OF THE ELLIOTT-LARSEN ACT, M.C.L. § 37.2101 *ET SEQ.* (SEX DISCRIMINATION)

230.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

231.   UM is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (ELCRA).

232.   Anderson was a "person" as that term is defined in ELCRA and was an agent of UM.

233.   Plaintiffs' sex was at least one substantial factor motivating Anderson to select Plaintiffs as victims of their sexual assaults.

234.   Had Plaintiffs been female, they would not have been targeted as victims by Anderson.

235.   By giving Anderson access to Plaintiffs, as their treating physician on UM's campus, Defendants, through agents, representatives, and employees, including Anderson were predisposed to discriminate based on Plaintiffs' sex and acted in accordance with that predisposition.

236.   By giving Anderson access to Plaintiffs, as their treating physician on UM's campus, Defendants, through agents, representatives, and employees, including Anderson, treated Plaintiffs differently from similarly situated female

students who UM did not give Anderson access to in the same way as it freely gave Anderson access to Plaintiffs and hundreds of other male students, based on unlawful consideration of sex.

237.   Defendants violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational program of UM and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

## COUNT VI:
## VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY

238.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

239.   The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law. . . ." Mich. Const., art. 1, § 17.

240.   The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart. The doctrine of substantive due process protects unenumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment and Mich. Const, art. 1, § 17.

241.   The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference.

242.   In a long line of cases, courts have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the right to bodily integrity.

243.   The right to be free of state-occasioned damage to a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process and Mich. Const., art. 1, § 17.

244.   The violation of the right to bodily integrity involves an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective.

245.   The United States Supreme Court and the Michigan appellate courts have recognized that no right is held more sacred, or is more carefully guarded, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

246.   The violation of the right to bodily integrity must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

247.   Defendants' official policies, customs and practices violated include:

49

a.   Failing to supervise, train and educate Anderson, Anderson's managers and/or Anderson's patients or their parents so that in the absence of this supervision, training and education Anderson's unlawful activities could be carried out;

b.   Actively concealing Anderson's abhorrent behavior; and

c.   Not investigating the complaints from students that began as early as 1968, not taking corrective actions, and allowing Anderson to remain employed as a physician at UM, despite knowing he sexually preyed on male students under the guise of medical treatment, further enabling Anderson to have unfettered sexual access to more students.

248.   Defendants' policies, customs and practices of permitting, condoning and reassigning Anderson, which enabled him to gain unfettered sexual access to students, exposed students to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

249.   The decisions which resulted in Defendants' violating Plaintiffs' constitutional rights as alleged in this Complaint were made by high level officials of Defendants.

**COUNT VII:**
**VIOLATION OF ARTICLE 1, § 17 SUBSTANTIVE DUE PROCESS –**
**STATE CREATED DANGER**

250.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

251.   Plaintiffs enjoyed a substantive due process right under the Michigan Constitution to avoid the risk of harm or danger created or increased by an

50

affirmative act of the state.

252.   This right is violated when the state: (1) engages in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party; (2) placed a plaintiff in a special danger, as distinguished from a risk that affects the public at large; and, (3) knew or should have known that its actions specifically endangered Plaintiffs.

253.   The state's (UM's) affirmative acts consisted of: (1) permitting, condoning and reassigning Anderson so that he could have sexual access to male students under the guise of medical treatment and then (2) concealing its knowledge that Anderson, by virtue of state policy, practice or custom was permitted to carry out his unlawful and abhorrent behavior.

254.   These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of violence or sexual assault by Anderson.

255.   Defendants' conduct created a special danger to Plaintiffs and others like them because the state's (UM's) actions specifically put this discrete group— young males—at increased risk in that the state knew that Anderson was taking advantage of the sacred patient-physician relationship in order to carry out his violence against Plaintiffs and other members of the same discrete group.

256.   Defendants knew or should have known that its affirmative acts specifically endangered Plaintiffs.

257.   Defendants established official policies, customs and practices, which permitted, condoned and actually promoted Anderson's access to male students so that he could both excessively grope and manipulate their genitals and digitally penetrate their anuses, while they sought medical treatment from him.

258.   The decisions resulting in Defendants' violation of Plaintiffs' constitutional rights as alleged in this Complaint were made by high level officials of Defendants.

259.   Defendants' official policies, customs and practices violated Plaintiffs' rights, and included, among other things, each of the below acts, which each independently violated Plaintiffs' rights:

    a.   Failing to supervise, train and educate Anderson, Anderson's managers or Anderson's patients or their parents (in the case of victims who were minors at the time of the assaults) so that in the absence of this supervision, training and education Anderson's unlawful activities could be carried out;

    b.   Actively concealing Anderson's abhorrent behavior;

    c.   Not investigating the complaints from students that began as early as 1968, not taking corrective actions, and allowing Anderson to remain employed as a physician at UM, despite knowing he sexually preyed on students under the guise of medical treatment, further enabling Anderson to have unfettered sexual access to more students; and

    d.   Not terminating Anderson when it became known he was a sexual predator.

260.   Defendants' policies, customs and practices of permitting, condoning

and reassigning Anderson, which enabled him to gain unfettered sexual access to students, exposed them to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

**COUNT VIII:**
**GROSS NEGLIGENCE**

261.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

262.   Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Anderson.

263.   Anderson owed Plaintiffs a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of Defendants.

264.   By seeking medical treatment from Anderson during his employment, agency, and/or representation of Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and Anderson was created, resulting in Anderson owing Plaintiffs a duty to use due care.

265.   Defendants' failure to adequately supervise Anderson, especially after UM knew or should have known of complaints regarding his nonconsensual sexual touching and sexual penetrations during genital and anal examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

53

266.   Anderson's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of Defendants and under the guise of rendering medical treatment was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

267.   Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

268.   Defendants' conduct as described above, demonstrated a willful disregard for substantial risks to Plaintiffs.

269.   Defendants breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs' health, safety, Constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

## COUNT IX:
## NEGLIGENCE

270.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

271.   Defendants owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives and/or agents.

272. By seeking medical treatment from Anderson in his capacity as an employee, agent, and/or representative of Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and Anderson was created, resulting in Anderson owing Plaintiffs a duty to use ordinary care.

273. Anderson owed Plaintiffs a duty of ordinary care.

274. Defendants' failure to adequately train and supervise Anderson breached the duty of ordinary care.

275. Defendants had notice through its own employees, agents, and/or representatives as early as 1968, and again in 1975 and 1979, of complaints of a sexual nature related to Anderson's predatory and criminal sexual genital and anal examinations of young male students.

276. Defendants should have known of the foreseeability of Defendants' sexual abuse of young males, from 1968 onward.

277. Defendants' failure to properly investigate, address, and remedy complaints regarding Anderson's conduct was a breach of their duty to use ordinary care.

278. Anderson's conduct in sexually assaulting, abusing, and molesting Plaintiffs during his employment, agency, and/or representation of Defendants was a breach of the duty to use ordinary care.

## COUNT X:
## VICARIOUS LIABILITY

279.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

280.   Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

281.   Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

282.   Defendants employed and/or held Anderson out to be their agent and/or representative from approximately 1966 to 2003.

283.   Defendants had the right to supervise Anderson's medical exams, and indeed had a duty to supervise Anderson.

284.   Defendants had an obvious and direct financial interest in allowing Anderson to continue rendering medical care for UM as Defendants financially gain from the operations of UHS and other medical facilities on UM's campus.

285.   Defendants are vicariously liable for the actions of Anderson as described above that were performed during his employment, representation, and/or agency with Defendants and while he had unfettered access to young males on UM's campus.

## COUNT XI:
## EXPRESS/IMPLIED AGENCY

56

286.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

287.   An agent is a person who is authorized by another to act on its behalf.

288.   Defendants intentionally or negligently made representations that Anderson was their employee, agent, and/or representative.

289.   Based on those representations, Plaintiffs reasonably believed that Anderson was acting as an employee, agent, and/or representative of Defendants.

290.   Defendants did have the right to control the conduct of Anderson.

291.   Anderson had the right and authority to represent or bind Defendants.

292.   Plaintiffs were injured as a result of Anderson's predatory sexual assault, abuse, and molestation as described above, acts that were performed during the course of his employment, agency, and/or representation with Defendants and while he had unfettered access to young male students and others.

293.   Plaintiffs were injured because they relied on Defendants to provide employees, agents, and or representatives who would exercise reasonable skill and care.

## COUNT XII:
## NEGLIGENT SUPERVISION

294.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

295.   Defendants had a duty to provide reasonable supervision of their

employee, agent and/or representative, Anderson, during employment, agency or representation with Defendants and while he interacted with young males including Plaintiffs.

296.   It was reasonably foreseeable given UM's knowledge that Anderson was a sexual predator of young college male students at the time UM first fired, then reinstated, and then demoted Anderson in 1980.[2]

297.   Defendants by and through their employees, agents, managers and/or assigns, knew or reasonably should have known of Anderson's conduct and/or that Anderson was an unfit employee, agent, and/or representative because of his sexual interest in male students.

298.   Defendants breached their duty to provide reasonable supervision of Anderson, and permitted Anderson, who was in a position of trust and authority, to commit the acts against Plaintiffs.

299.   The sexual abuse occurred while Plaintiffs and Anderson were on the premises of UM, and while Anderson was acting in the course of his employment, agency, and/or representation of Defendants.

300.   Defendants tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen,

---

[2] The firing occurred in 1979 but was intended to be effective in 1980.

counsel, or discipline such individuals, with the result that Anderson was allowed to violate the rights of persons such as Plaintiffs with impunity.

## COUNT XIII:
## NEGLIGENT FAILURE TO WARN OR PROTECT

301.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

302.    Defendants knew or should have known that Anderson posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

303.    As early as 1968, Defendants had direct and/or constructive knowledge as to the dangerous conduct of Anderson and failed to act reasonably and responsibly in response.

304.    Defendants knew or should have known Anderson committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

305.    Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Anderson.

306.    The duty to disclose this information arose by the special, trusting, confidential, and fiduciary relationship between Anderson as an employee, agent, and or representative of Defendants and Plaintiffs.

307.    Defendants breached said duty by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Anderson.

308.    Defendants breached their duties to protect Plaintiffs by failing to:

a. Respond to allegations of sexual assault, abuse, and molestation;

b. Act on evidence of sexual assault, abuse, and molestation; and,

c. Investigate, adjudicate, and terminate Anderson's employment with UM prior to his treatment of Plaintiffs.

309. Defendants failed to adequately screen, counsel and/or discipline Anderson for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in violations of Plaintiffs' rights.

310. Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Anderson's conduct.

## COUNT XIV:
## NEGLIGENT FAILURE TO TRAIN OR EDUCATE

311. Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

312. Defendants breached their duty to take reasonable protective measures to protect Plaintiffs and other young men and minors from the risk of sexual assault by Anderson, such as the failure to properly train or educate Plaintiffs and other young men and minors about how to avoid such a risk.

313. Defendants failed to, among other things, implement reasonable safeguards to:

a. Prevent acts of sexual assault;

b. Avoid placing Anderson in positions where he would be in

60

unsupervised contact and interaction with Plaintiffs and other young males;

c.      Educate students such as Plaintiffs on reporting and/or preventing unwanted touching and penetrations from authority figures, especially given UM's knowledge it was putting a predator such as Anderson in contact with young male students; and

d.      Training or educating UM employees to be aware of improper touching, especially given UM's knowledge it was putting a predator such as Anderson in contact with young males.

## COUNT XV:
## NEGLIGENT RETENTION

314.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

315.   Defendants had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but they failed to do so.

316.   Defendants were negligent in the retention of Anderson as an employee, agent, and/or representative in their failure to adequately investigate, report and address complaints about his conduct of which they knew or should have known.

317.   If Defendants had not retained Anderson, and instead fired him, Plaintiffs' injuries would not have occurred.

318.   Defendants were negligent in the retention of Anderson as an employee, agent, and/or representative after they discovered, or reasonably should have discovered, Anderson's conduct which reflected a propensity for sexual misconduct.

61

319.   Defendants' failure to act in accordance with the standard of care resulted in Anderson gaining access to and sexually abusing and/or sexually assaulting Plaintiffs and an unknown number of other individuals.

320.   The negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Anderson created a foreseeable risk of harm to Plaintiffs as well as other young men.

## COUNT XVI:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

321.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

322.   Defendants allowed Anderson to be in a position where he could sexually assault, abuse, and molest minors and young men. Defendants' actions were extreme and outrageous.

323.   A reasonable person would not expect Defendants to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew of complaints and claims of sexual assault and abuse occurring during Anderson's genital examinations.

324.   Defendants held Anderson in high esteem and acclaim which in turn encouraged Plaintiffs and others to respect and trust Anderson and to not question his methods or motives.

325.   A reasonable person would not expect Defendants to be incapable of

supervising Anderson and/or preventing Anderson from committing acts of sexual assault, abuse, and molestation.

326.   Defendants' intentional and/or reckless conduct as described above caused Plaintiffs severe emotional distress.

## COUNT XVII:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

327.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

328.   By allowing Anderson to be in a position where he could sexually assault, abuse, and molest minors and young men, Defendants were negligent.

329.   Defendants' negligence proximately caused Plaintiffs to be sexually assaulted by Anderson.

330.   Plaintiffs have suffered severe damages related to the sexual assault as well as from discovering they were victims of sexual assault caused by the actions of UM and their beloved alma mater.

331.   Events caused by Defendants, Anderson's sexual assault of Plaintiffs, naturally and probably resulted in emotional distress.

332.   Events caused by Defendants, Anderson's sexual assault of Plaintiffs, did in fact result in emotional distress.

## COUNT XVIII:
## FRAUD AND MISREPRESENTATION

333.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

334.   From approximately 1966 to 2003, Defendants represented to Plaintiffs and the public that Anderson was a competent and safe physician.

335.   By representing that Anderson was a physician at UM, Defendants represented to Plaintiffs and the public that Anderson was safe, trustworthy, of high moral and ethical repute, and that Plaintiffs and the public need not worry about being harmed by Anderson.

336.   The representations were false when they were made as Anderson had and was continuing to sexually assault, abuse, and molest Plaintiffs and an unknown number of other individuals.

337.   Between 1968 and 1979, and perhaps earlier, Defendants received numerous complaints about Anderson's sexual assaults of male patients in the guise of genital and anal examinations, yet misrepresented his firing as Director of UHS as a "resignation" in oral and written representations to the UM community and public at large, when they knew Anderson was first fired, then reinstated with a demotion, as a result of his sexually predatory conduct toward college age males like Plaintiffs.

338.   Although UM was informed of Anderson's conduct they failed to investigate, remedy, or in any way address the patients' complaints.

64

339.   Defendants continued to hold Anderson out as a competent and safe physician.

340.   Defendants made such misrepresentations intending Plaintiffs and others similarly situated to rely on them.

341.   Plaintiffs relied on the assertions of Defendants and continued to seek treatment from Anderson in the wake of concerns and dangers known only to Defendants.

342.   Plaintiffs were subjected to sexual assault, abuse, and molestation as a result of Defendants' fraudulent misrepresentations regarding Anderson.

## VIII.   **PLAINTIFFS' DAMAGES**

343.   Plaintiffs first learned Anderson was a serial sexual predator on or around February 19, 2020, when the news broke that several former students had come forward with stories of sexual abuse at the hands of Anderson under the guise of medical treatment while students at UM or patients of UM Health System.

344.   Plaintiffs' damages arise from two distinct and exclusive harms: (1) the revelation that Anderson's odd or weird acts, were not in fact, innocent odd or weird, but rather criminal sexual conduct motivated by Anderson's illegal sexual intent, and so Plaintiffs were sexual assault victims; and (2) the revelation that UM —an integral part of Plaintiffs' lives and identities—foisted a sexual predator on Plaintiffs in the guise of a competent and concerned medical physician.

345.   Since this revelation, Plaintiffs have been suffering shame, shock, humiliation, emotional distress and related physical manifestations thereof, embarrassment, loss of self-esteem, and disgrace.

346.   The news about Anderson has disturbed Plaintiffs' innate sense of self-worth and self-identity, leading to anxiety and depression.

347.   Plaintiffs have also suffered deeply, emotionally and psychologically, in ways that have manifested physically, from discovering on February 19, 2020 that UM and their beloved alma mater knew about Anderson's sexual assaults for decades and did nothing to stop him.

348.   Aside from these understandable injuries, other harms include: (1) feeling betrayed because they were not protected by UM; (b) feeling betrayed because UM forced Anderson on them knowing Anderson was a predator;  (c) worries and anxiety that friends and family may find out that Plaintiffs are victims; (d) anxiety about future interactions with UM; and (e) extreme anxiety about how these harms will manifest themselves in Plaintiffs' middle age and/or senior years.

349.   The revelation—that despite knowing of Anderson's misconduct, UM knowingly kept Anderson in positions where he had direct and intimate access to prey upon college students and others, such as Plaintiffs, from 1966 to 2003—has been traumatic and emotionally and psychologically damaging, forcing Plaintiffs to relive the trauma of what they now know was sexual assault.

350.   It has shattered Plaintiffs psychologically and emotionally to learn the university they spent their lives being devoted to betrayed them and so many others by placing a sexual predator on staff where he had direct and unlimited access to young college students.

351.   As a direct and/or proximate result of Defendants' conduct, Plaintiffs suffered and will continue to suffer discomfort, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and such other injuries and physical manifestations as may appear during the course of discovery and trial in this matter.

352.   These irreparable harms Plaintiffs suffer, and will continue suffering, are proven damages typically suffered by young men when sexually assaulted by another man who is a trusted person and/or medical provider.

353.   Symptoms of male sexual abuse on male adults can last for decades and affect their lives in many ways from causing sexual dysfunction and the inability to engage in close relationships with others to confusion about sexual identity, embarrassment and depression. See *Male Victims of Male Sexual Assault: A Review of Psychological Consequences and Treatment* (Sexual and Relationship Therapy, August 2001); *Effects of Sexual Assaults on Men: Physical, Mental and Sexual Consequences* (International Journal of Men's Health, Vol. 6, No. 1, Spring 2007,

pp. 22-35).

354.   Psychological damage from sexual abuse is especially harmful when the perpetrator is known and trusted by the victim. See *Integration of Sexual Trauma in a Religious Narrative: Transformation, Resolution and Growth among Contemplative Nuns* (Transcult Psychiatry, Feb 2013 – 50 (1): 21-46); *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement Can Respond* (EVAW's OnLine Training Institute, May 2019, p. 34).

355.   When sexual abuse is perpetrated by a medical provider, patients often lack the ability to comprehend the abuse due to the provider's position of access, trust and authority and commonly suffer from emotional distress, humiliation, and the inability to trust medical care providers or the medical care professional generally. See *Above All, Do No Harm: Abuse of Power by Health Care Professionals*, by Kathleen S. Lundgren, Wanda S. Needleman, Janet W. Wohlberg (2004), available at https://www.therapyabuse.org/p2-abuse-of-power.htm.

356.   In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm.

**WHEREFORE,** Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against Defendants on all counts and claims above in an amount consistent with the proofs of trial, and seek an award against Defendants for all appropriate damages arising out of law, equity, and fact for each or all of the

above counts where applicable, including but not limited to:

a.  Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

b.  Punitive and/or exemplary damages in an amount to be determined as reasonable or just the trier of fact;

c.  Reasonable attorney fees, interest, and costs; and,

d.  Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young male students and other individuals, as appears to be reasonable and just.

Respectfully submitted,

**Flood Law PLLC**

By /s/ Todd F. Flood
    Todd F. Flood (P58555)
    Rachel K. Wolfe (P79204)
    155 W Congress St Ste 603
    Detroit, MI 48226-3267
    (248) 547-1032
    tflood@floodlaw.com

Dated: May 8, 2020

## JURY DEMAND

Plaintiffs, by and through their attorneys, Todd F. Flood and the Flood Law

PLLC, hereby demand a trial by jury on all claims set forth above.

Respectfully submitted,

**Flood Law PLLC**

By /s/ Todd F. Flood
      Todd F. Flood (P58555)
      Rachel K. Wolfe (P79204)
      155 W Congress St Ste 603
      Detroit, MI 48226-3267
      (248) 547-1032
      tflood@floodlaw.com

Dated: May 8, 2020